**John E. LIESS and J. Christopher Whitford, Plaintiffs,**

**v.**

**GENERAL ELECTRIC COMPANY, and General Electric Information Services Company, Defendants.**

**No. 86 C 3704.**

United States District Court, N.D. Illinois, E.D.

May 14, 1987.

Gould & Ratner, Chicago, Ill., for plaintiffs.

John M. Carroll, George N. Vurdelja, Jr., Mayer, Brown & Platt, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

■ Defendants move for an order disqualifying the law firm of Gould & Ratner from serving as plantiffs' counsel in this action, on the ground that its continued representation of plaintiffs would be inconsistent with two provisions of the American Bar Association's Model Code of Professional Responsibility: DR 5–102(A), which requires a lawyer and his firm to withdraw if the lawyer learns he ought to be called as a witness on behalf of his client; and DR 5–102(B), which requires a lawyer and his law firm to withdraw if it becomes obvious that he may be called as a witness other than on behalf of his client, and his testimony may be prejudicial to his client.[1]

### I.

Defendant General Electric Information Services Co. ("GEISCO") is a subsidiary of defendant General Electric Co., and purchased all shares of Network Consultants, Inc. ("NCI") pursuant to an agreement in 1982. Plaintiffs John Liess and Christopher Whitford were shareholders and directors of NCI at the time of this transaction. The agreements made plaintiffs' remuneration for their shares partially dependent on NCI's performance in the two years after the sale.

Plaintiffs contend that GEISCO represented in negotiations that during this two-year "earn-out" period it would refrain from competing with NCI's business, would continue operating NCI with as little disruption as possible, and would aggressively promote its products and services. In fact, plaintiffs allege, GEISCO systematically sabotaged NCI's business after acquiring NCI; they say that it competed directly and indirectly with NCI, decimated NCI's marketing program, tied sales of NCI's products to inferior GEISCO products, and revised the price structure of NCI's products so that they were no longer competitive. Plaintiffs contend that as a result they earned substantially less than they expected through the earn-out provision.

Count I of the complaint alleges that this interference violated the agreement and breached defendants' fiduciary duty to plaintiffs. Count II accuses defendants of fraudulently misrepresenting their plans for NCI in order to induce plaintiffs to sign the agreement.

Thomas Korman is a partner in Gould & Ratner, and in that capacity represented NCI and its shareholders during negotiation of the 1982 agreement with GEISCO; he is not, however, participating in Gould & Ratner's representation of plaintiffs in this action. Defendants maintain that Korman is likely to be a witness in this case for two reasons, each of which provides a basis for Gould & Ratner's disqualification. First, Korman was the only person other than Liess and GEISCO representatives to attend several key negotiation sessions. Defendants argue that this makes him the only person likely to corroborate Liess's account of GEISCO's misrepresentations at those sessions, and to support plaintiffs' construction of ambiguous portions of the agreement. Therefore, defendants conclude, plaintiffs ought to call Korman at trial. Second, Korman gave testimony at his deposition that defendants believe weakens plaintiffs' case on both counts of the complaint, and defendants say they

---

**1.** The parties do not contest the applicability of the Model Code to lawyers practicing before the Northern District of Illinois. The court likewise believes that the Model Code governs the conduct of lawyers appearing before it. *See* N.D.Ill. Local Rule 3.54(B); *May's Family Centers, Inc. v. Goodman's, Inc.,* 590 F.Supp. 1163 (N.D.Ill. 1984).

plan to call him at trial to repeat this testimony.

Liess and Whitford state by affidavit that they know of defendants' motion to disqualify Gould & Ratner and have read the briefs on that motion as well as relevant portions of Korman's deposition transcript. They say that Gould & Ratner has long represented them, that they entered into this litigation with the expectation that it would represent them, and that they want Gould & Ratner to continue to represent them even if Korman does become a witness. Disqualifying the firm, plaintiffs assert, would waste hundreds of hours they have spent preparing the case with Gould & Ratner lawyers.

With this as background, the court now examines defendants' two arguments for disqualifying Gould & Ratner.

## II.

■ Defendants maintain that DR 5-102(A) bars Gould & Ratner from serving as plaintiffs' counsel because plaintiffs ought to call Korman to testify on their behalf at trial. DR 5-102(A) provides:

> If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue the representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5-101(B)(1) through (4).[2]

Defendants have not established that plaintiffs "ought" to call Korman as a witness at trial. The portions of Korman's deposition before the court do not indicate that he heard or recalls any of the misrepresentations alleged by Liess, and nothing in the record permits the court to conclude that Korman's recollection of the negotiations differs from that of any other participant. In determining whether a lawyer "ought" to be called, "[t]he test is whether

the attorney's testimony could be significantly useful to his client." *MacArthur v. Bank of New York*, 524 F.Supp. 1205, 1208 (S.D.N.Y.1981). Because defendants have not shown that Korman's testimony could be significantly useful to plaintiffs, DR 5-102(A) does not require Gould & Ratner's disqualification. Moreover, even if it were apparent plaintiffs ought to call Korman as their witness, DR 5-102(A) would not require Gould & Ratner's disqualification until trial. *May's Family Centers, Inc. v. Goodman's, Inc.*, 590 F.Supp. 1163, 1166 (N.D.Ill.1984).

## III.

As an alternative basis for Gould & Ratner's disqualification, defendants invoke DR 5-102(B), which provides:

> If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm may be called as a witness other than on behalf of his client, he may continue the representation until it is apparent that his testimony is or may be prejudicial to his client.

Defendants assert that Korman's deposition testimony gives them two reasons to call him at trial. First, his testimony suggests GEISCO never represented that its products would not compete with NCI's. Second, he testified that during negotiation of the agreement he told Liess the agreement would not prevent GEISCO from interfering with NCI's profitability after the sale.

## A.

Korman attended either two or three negotiation sessions with Liess and GEISCO representatives (Korman dep. at 3), and was present at what Liess has referred to as the "principal" meetings (Liess dep. at 104). Although Korman's memory is hazy about the details of the negotiations—he attributes this at least in part to his participation in 50 to 60 corporate transactions between the time of the NCI–GEISCO deal and his deposition (Korman dep. at 18)—he did testify unequivocally that there never

2. Neither party claims any of those circumstances are present here.

was any discussion of competition between GEISCO and NCI at the meetings he attended, or in the telephone conversations in which he participated (*id.* at 49). Moreover, he testified that he can recall nothing about representations by GEISCO either of its plans for NCI or of how those plans would affect NCI's profitability during the earn-out period (*id.* at 73).

This testimony, from a witness with no apparent reason for bias in favor of defendants, suggests that GEISCO never made the alleged representations about competition between the business lines of the two companies, or that if it did make such representations they played no significant role in the negotiations. While plaintiffs attempt to minimize the significance of Korman's testimony by claiming he said only that he could not remember the negotiations, this is inconsistent with the deposition transcript; Korman's memory is sparse but it is not a vacuum, and he did testify that no discussions of potential competition between NCI and GEISCO occurred in his presence. Because of Korman's prominent role in the negotiations, this testimony tends to support defendants' contention that GEISCO made no representations about competition between the two companies. Accordingly, it is "apparent that [Korman's] testimony is or may be prejudicial to" plaintiffs.

### B.

Defendants' second rationale for calling Korman at trial—that in his deposition he admitted telling Liess the agreement would not prevent GEISCO from interfering with NCI—rests on the following testimony:

One area in our negotiation involved ...NCI's ability to achieve an earn-out. I don't even know where it is in here.

Initially in GEISCO's draft to us GEISCO had drafted something, and I'm paraphrasing, that they had unlimited rights to do whatever they want as management to the company.

At [a meeting attended by Korman, Liess, and two GEISCO representatives, Bob Streight and Dave Sherman], we discussed our feelings toward that clause —"we" meaning Jack Liess—and Jack said, "That gives us a great deal of discomfort because we don't want you to hinder our ability to achieve the earn-out."

A re-draft of that particular section was given to Bob Streight by, I believe, Dave Sherman, because this is the—this was the GEISCO form of purchase agreement.

And Bob Streight came to Jack and said, "This is essentially all I can do." It gave some comfort but not as much comfort as a seller would have wanted because it—as I talked to Jack, I said unequivocally they're not going to say they're not going to interfere and you just have to have a certan degree of trust.

Bob Streight indicated to Jack, he said, "This is as far as I can go," and Bob Streight was a business person as Jack was, but he said to Jack, he said, "What's good for NCI"—"What's good for GEISCO will be good for NCI", that's what he said.

When he said that I looked at Jack and I said, "You have to either trust the individual or you don't trust the individual, and you have to make that decision." At that point Jack said, "Okay."

(Korman dep. at 22–23).

Because the agreement does not expressly prohibit GEISCO from interfering with NCI's profitability during the earn-out period, plaintiffs can prevail on their breach of contract claim only by establishing that the agreement's language is ambiguous in this respect, and that the parties intended the ambiguous language to prohibit such interferences. Korman's testimony that Liess understood the agreement would have no such effect obviously reduces plaintiffs' chances of prevailing on the issue of intent, and therefore "is or may be prejudicial to [Gould & Ratner's] client."

### IV.

The court understands plaintiffs' desire to continue with Gould & Ratner as their counsel. They have had a long and apparently satisfactory relationship with that

firm, and have worked closely with it during the course of this litigation. Judicial intrusion into this inherently personal relationship between client and lawyer is unwelcome.

■ But the language of DR 5–102(B) is mandatory; a firm may not continue representing a client once it becomes obvious that another party may call a lawyer in that firm as a witness, and the lawyer's testimony is or may be prejudicial to the client. Although courts have cautioned against encouraging motions to disqualify because of the risk that lawyers will use such motions to harass opposing parties, *see Bottaro v. Hatton Associates,* 680 F.2d 895, 897 (2d Cir.1982), *ABA/BNA Lawyers' Manual on Professional conduct* 61:507 (1984), they have not hesitated to disqualify counsel when a violation of DR 5–102 is present, *see MacArthur v. Bank of New York,* 524 F.Supp. 1205.

■ By prohibiting a law firm from serving as counsel in a case where one of its lawyers is likely to be a hostile witness, DR 5–102(B) averts several risks to the integrity of the judicial process: the possibility that a lawyer would find it difficult to impeach or cross-examine her partner; the danger that jurors would be distracted from the merits of the case by speculation about the unusual nature of the representation; and the difficulty of knowing whether a client has validly waived any potential conflict of interest when the client is advised by the lawyers whose representation is at stake and the lawyers may be reluctant to jeopardize the client relationship by insisting on withdrawal against the client's wishes. *See MacArthur v. Bank of New York,* 524 F.Supp. at 1208–09; *ABA/BNA Lawyers' Manual on Professional Conduct* 61:503–506 (1984). In sum, "[t]he experience of the bar and its collective voice in the ABA Canons demands the separation of the roles of advocate and witness. Experience shows that one who combines both roles is not likely to be, as an officer of the court, helpful to the court." *General Mill Supply Co. v. SCA Supply Services, Inc.,* 697 F.2d 704, 712 (6th Cir.1982).

■ The record in this case demonstrates a strong likelihood that defendants will call Korman at trial and that his testimony will be prejudicial to plaintiffs. Defendants did not wait until the eve of trial to raise the ethical difficulty that Gould & Ratner's representation of plaintiffs poses, but instead filed their motion to disqualify at an early stage of this litigation, soon after the basis for the motion became apparent. Although plaintiffs will be inconvenienced by Gould & Ratner's disqualification, they have neither claimed nor shown the expectional circumstances and hardship that might entitle them to relief from disqualification under DR 5–101(B)(4).

Defendants' motion to disqualify Gould & Ratner is granted. DR 5–102(B) prohibits Gould & Ratner from continuing to serve as plaintiffs' counsel. Gould & Ratner is ordered to withdraw its appearance after the expiration of a reasonable time for plaintiffs to secure alternative counsel.